

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00384-CV

_____

IN THE INTEREST OF J.B., A CHILD

On Appeal from the 325th District Court
Tarrant County, Texas
Trial Court No. 325-702195-21

Before Sudderth, C.J.; Kerr and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

J.B.[1] tested positive for cannabinoids and amphetamine when he was born and—according to an investigator for the Department of Family and Protective Services (DFPS) and to statements in the medical records from J.B.'s birth—Mother claimed that Appellant Father had made her use drugs while pregnant. However, Father had been incarcerated in the Tarrant County Jail at J.B.'s June 2021 birth and for several months before that.

DFPS filed a conservatorship-and-termination petition, removed the child before Mother left the hospital, placed the child into foster care, and developed service plans for both parents, but Father was unable to participate in the services while incarcerated. Neither parent testified during trial, and the trial court terminated Father's parental rights to J.B. based on the child's best interest and the grounds of endangerment, constructive abandonment, and failure to follow the court's order specifying the actions necessary for him to obtain J.B.'s return. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (2).[2]

---

[1]To protect J.B.'s identity, we use aliases or initials to refer to him, his parents, and others who may be connected to the case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]The trial court also terminated Mother's parental rights, but Mother did not appeal.

In four issues, Father appeals, arguing that the evidence is legally and factually insufficient to support the trial court's endangering-conduct ground and factually insufficient to support the trial court's endangering-environment, failure-to-follow-court-order, and constructive-abandonment findings. Because the evidence is legally and factually sufficient to support the endangering-conduct ground, we affirm the trial court's judgment without reaching Father's remaining issues. *See* Tex. R. App. P. 47.1.

## II. Background

### A. First day of trial: April 27, 2022[3]

Trial began with neither parent in attendance, although both were represented by counsel.

#### 1. J.B.'s medical records

The medical records from J.B.'s birth were not discussed in depth during the trial, but because they were admitted into evidence, we have reviewed them.[4] The records contain the following statements made by Mother to medical personnel about Father:

---

[3]Trial occurred over three days in three separate months but testimony was taken during only two of those days. Because the portion of trial between April 27 and September 2 has no bearing on this appeal, we do not include it.

[4]The trial court admitted the medical records over Father's objections that he had not seen the records and that they might contain hearsay. Father does not raise those objections on appeal.

- Father "was abusive[,] used drugs[,] and [had] forced [Mother] to do things that she did not want to do."[5]

- Mother called the police on Father and "that is why he [wa]s in jail."

- "[Father was] in jail due to assault on her," and since she was 18, he had made her "'do things [she] normally wouldn't do[,]'" including using "zbars,[6] cocaine, [THC[7]], and methamphetamine." Mother was 31 years old when J.B. was born.

- Although Father was incarcerated, he was "helpful and supportive."

- Mother "had no prenatal care and state[d Father] was angry at her for getting pregnant and not having an abortion" and that it had been "two months since she talked to him."

- Mother had no supplies for the baby; Father "took it all back."

Mother's medical records state that she suffers from schizoaffective disorder, bipolar type, as well as the following "Active Problem[s]": diabetes; amphetamine, cocaine, and cannabis abuse; anxiety and depression; methamphetamine dependence; and posttraumatic stress disorder. Other evidence at trial reflected that all of

[5]Mother also told medical personnel that she had not used drugs in a year, which statement was contradicted by J.B.'s positive drug test results and her later admission that she had used methamphetamine two to five days before giving birth.

[6]"Zbar" is a street name for the anti-anxiety prescription drug Xanax. *Pawlak v. State*, No. 13-10-00535-CR, 2012 WL 3612493, at *1 n.3 (Tex. App.—Corpus Christi–Edinburg Aug. 23, 2012) (mem. op., not designated for publication), *vacated on other grounds*, 420 S.W.3d 807 (Tex. Crim. App. 2013); *Hernandez v. State*, No. 13-06-357-CR, 2007 WL 2965527, at *2 n.3 (Tex. App.—Corpus Christi–Edinburg Oct. 11, 2007, no pet.) (mem. op., not designated for publication).

[7]THC is an abbreviation for tetrahydrocannabinol, which is marijuana's active ingredient. *Harper v. State*, 508 S.W.3d 461, 466 n.7 (Tex. App.—Fort Worth 2015, pet. ref'd).

Mother's previous cases with DFPS had also involved drug use; four of her children lived with their maternal grandmother, and her parental rights to a fifth child had been terminated on endangerment grounds.

### 2. DFPS investigator

Tayla Choice, the DFPS investigator who met Mother at the hospital after J.B. tested positive for drugs, testified that Mother told her that Father made her use drugs and that if she refused to use methamphetamine, Father would beat her. Choice did not speak with Father or exchange any written communications with him but said that DFPS had made contact with him before J.B.'s removal.

Choice said that Father provided some placement options but not to her. She called T.H.-B., one of Father's adult children, whom Father had listed as a placement option, but received no response. She ran a background search on T.H.-B. and found nothing unfavorable that would prevent pursuing her as a placement. Nevertheless, Choice said that DFPS does not pursue a placement option who is not amenable to placement.

Choice testified that at the end of her investigation, she and her supervisor determined that a removal was proper, and her disposition of the case was "reason to believe"[8] for neglectful supervision by Mother. DFPS filed its original petition on June 24, 2021, and the trial court entered its emergency order on removal that day.

---

[8]*See* 40 Tex. Admin. Code § 707.495(b) (Tex. Dep't of Fam. & Protective Servs., How do we make dispositions after completing the investigation?) (listing the

5

### 3. Caseworker

Joan Hall, an OCOK[9] permanency specialist, testified that she had been the case's only caseworker. As of April 27, 2022, Father had been incarcerated during the entire case, and Hall had visited Father in person twice: in November 2021 and April 2022. She had also sent him five to six letters, but he told her that he did not receive them. When asked whether she had any reason to disbelieve Father's claim that he had not received her letters, Hall replied, "Potentially." She stated, "I have had other cases where sometimes the [letters] – I have mailed them and the inmates said that they didn't receive them."

When asked how many children Father had told her that he had, Hall stated, "He approximated 13," most of whom were minors.[10] He denied having ever engaged in domestic violence and did not talk with Hall about other assaults, drug use,

---

following dispositions: reason-to believe based on a preponderance of the evidence, ruled-out, unable to complete, unable-to-determine, and administrative closure).

[9]OCOK (Our Community Our Kids) is a contractor that provides conservatorship services for DFPS. *See In re A.G.*, No. 02-21-00297-CV, 2022 WL 488924, at *8 n.14 (Tex. App.—Fort Worth Feb. 17, 2022, pet. denied) (mem. op.).

[10]When asked whether she knew if Father had been involved in the lives of any of his other children, Hall replied, "To my knowledge it's been sporadic, his involvement," but she agreed that she had no personal knowledge of his involvement in any of his other children's lives. She had spoken with Father's adult child R. about R.'s then-current relationship with Father but not about R.'s childhood: "She said that they talk." Father's other adult child, T.H.-B., told Hall that she did not believe that he was responsible "for what he's been charged with currently." T.H.-B. and Hall did not talk about T.H.-B.'s relationship with Father during her childhood. Hall testified that the first time she spoke with T.H.-B. was the week before the April trial began.

6

how long he had been in jail, or how many times he had been to jail.[11]  When Hall

asked Father why—in April 2022—he was in jail, Father told her that he had never

assaulted Mother and that "the fraudulent identities in his car were actually [Mother's,]

not his."

Father told Hall that Mother had mental-health issues and said that he was in

jail on a misunderstanding.  According to Father, his trial date on the pending charges

was set for May 2022.  Hall agreed that Father had been in jail for several months

before J.B.'s birth and had never been around the infant.  During cross-examination,

when asked whether—because of his incarceration—it was impossible for Father to

have ever put J.B. in danger, Hall replied, "Correct."  However, on redirect, Hall

clarified that Father's forcing Mother to use drugs while pregnant would have put J.B.

in danger and that she did not know if Father had been incarcerated for the entirety of

Mother's pregnancy.

Hall testified that DFPS had created a service plan in which Father was

supposed to

> complete . . . batterer's intervention classes, to complete a drug and
> alcohol assessment and follow all recommendations, to engage in
> random drug testing or comply with random drug testing, to engage [in]
> and complete individual counseling, to engage [in] and complete a
> FOCUS for Fathers[] class, [to] attend all visitation that was possible,

---

[11]Hall testified that she had reviewed Father's criminal history, and when asked "how many charges" he had accrued over the years, she replied, "[A]pproximately 20."  Hall also stated that Father had a prior DFPS case, but she provided no details about the case or its outcome.

and [to] notify the department or OCOK if he was ever released from jail.[12]

According to Hall, Father was also supposed to take a parenting class. The service plan also required that upon his release from incarceration, Father would "maintain safe, stable and appropriate housing with working utilities," free from safety hazards, and that he would maintain stable and legal employment, demonstrating the ability to meet J.B.'s financial needs. The trial court entered an order making the service plan a court order, which included supervised visitation. The service plan listed the date by which Father was to achieve his permanency goals as June 27, 2022, which was the case's original dismissal date.

Hall noted that, as far as she knew, none of the services were available to Father in jail, and she characterized his participation in the case as "very limited due to hi[s] being incarcerated." Hall stated that Father had indicated a willingness to participate in the services if they were available, and she acknowledged that he had done everything service-plan-wise that he could while incarcerated. Hall said that to her knowledge, the jail did not perform any random drug testing, stating, "I don't think they do that." Hall also testified that it was uncommon for DFPS to arrange visits with incarcerated parents and that she had never seen it happen.

---

[12]Father's service plan required him to notify OCOK within 72 hours of being released from incarceration. On the trial's third day, in September 2022, Hall testified that Father had contacted her "about three days" after his late June or early July 2022 release.

8

Father did not send J.B., an infant, any letters, but he asked Hall for photographs of the child, and she told him that she would send some.[13] He told Hall that he wanted to be involved in J.B.'s life and that he did not want his rights to be terminated. Father gave Hall potential placements for J.B. with two of his adult children—R. and T.H.-B.—but R. denied being able to be a placement, and T.H.-B. admitted that she was unable to care for J.B.'s medical needs[14] and did not have appropriate options for child care. Hall also said that T.H.-B. "had a history of not being protective in other investigations," but she did not elaborate on who had been investigated or why.

Over Father's objection, the trial court admitted into evidence a copy of Father's indictment for his then-pending family-violence assault charge relating to Mother.[15] The first count of the indictment alleged that on or about January 12, 2021,

---

[13]Hall testified that she had mailed some photographs to Father but that he had said he did not receive them. Hall stated that she "had planned to go in" person to deliver some photographs to Father later in April, "after th[e] hearing."

[14]J.B. has a weak immune system and reactive airway disease (which, according to Hall, means that he will be diagnosed with asthma when older). He suffers from frequent ear infections, had to have breathing treatments, and had been hospitalized twice due to illness. He had been seen by a pulmonologist and an ear-nose-throat specialist, and at one point he saw a specialist about a kidney infection that subsequently cleared up.

[15]Father's counsel raised a Rule 403 objection to the indictment's admission, complaining that its prejudice substantially exceeded its probative value because "it is nothing more than just an allegation." Father does not complain about the trial court's ruling on appeal.

Father had intentionally or knowingly caused bodily injury to Mother, a member of his family or household or with whom he had a dating relationship, by "impeding the normal breathing or circulation of the blood" by applying pressure to Mother's throat or neck with his hand or hands.

The second count of the indictment alleged that Father had pushed Mother, grabbed her, or struck her with his hand, squeezed her throat or neck with his hand or hands, scratched her with his hand, or kicked her with his foot. The indictment contained an enhancement alleging that Father had a 2005 conviction for family-violence assault and a habitual-offender notice reciting his prior felony convictions for unlawful possession of a firearm in 2014 and possession of cocaine (more than one but less than four grams) in 2005. Hall agreed that because J.B. was born in June and had not been born early, Mother would have been pregnant at the time of the January 12, 2021 assault alleged in the indictment. Hall believed the indictment's allegations and said, "Yes," when asked whether she had based her belief on what "somebody else says . . . [Mother] told them."

Hall testified that she did not believe Father could meaningfully participate in J.B.'s life from prison and stated that he had not meaningfully participated in J.B.'s life since the case began. She stated that it was in J.B.'s best interest to terminate Father's parental rights because he "has a significant history not only of violent crimes but also domestic violence and assaults against almost all of the mothers of his other children." Hall believed that Father "would not be a safe caregiver for [J.B. because

10

e]ven if he were [to be] released . . . there would not be enough time in this case for him to be able to participate in services and address all of these concerning issues for him to safely care for [J.B.]" She did not elaborate on Father's criminal history.

Hall testified that DFPS's plan was for J.B. to be adopted by his foster parents, who were safe, stable, and appropriate and met J.B.'s physical and emotional needs.[16] Hall testified that neither Mother nor Father had shown the ability to be safe and appropriate with J.B. or the ability to provide him with a safe and stable home and financial support.

### 4. DFPS investigative supervisor

Jessica Eastman, DFPS's investigative supervisor on the case, testified that she met Father prior to J.B.'s removal and conversed with him about the allegations in the case regarding Mother's drug use. "[Father] stated that he had knowledge that [Mother] . . . had been using methamphetamine[] heavily [and] that he had had a discussion with her about stopping and the impact it could have on the child." Eastman did not speak with him at that time about Mother's allegations regarding his having forced her to use methamphetamine. Eastman and Father discussed his criminal history, and he told her that he had been on parole or bond for a prior family-violence charge when he and Mother argued about her drug use, an argument

---

[16]During the third day of trial, in September 2022, Hall added that J.B. was "doing really well" in foster care, was receiving ECI therapy, and had a surgical procedure to install tubes in his ears because of his frequent ear infections. He was still sick on a regular basis, but the ear infections had become less frequent.

that led to her calling the police and his arrest. He did not tell Eastman that he had choked Mother as alleged in the indictment, but that allegation concerned her because choking a pregnant woman can harm the fetus.

Father gave Eastman the name of one of his adult daughters as a possible placement for J.B., but the adult daughter demanded DNA evidence of Father's paternity first.[17] Father told Eastman that the last time DFPS was involved in his life, three of his other children had been removed while he had been incarcerated.

## B. Last day of trial: September 2, 2022

Before testimony resumed, Father's counsel stated that he had filed a motion for continuance when Father was briefly out of jail, but he noted that Father had since been reconfined "for a circumstance that he was not involved in, and he expect[ed] to be released soon." Father's counsel asked for a continuance until Father could be released, and the trial court denied it.

The trial court then admitted into evidence over Father's Rule 403 objection[18] a certified copy of a complaint alleging that on or about July 12, 2022, Father had intentionally or knowingly threatened bodily injury to L.B.[19] and used or exhibited a

---

[17]The record does not contain Father's DNA test, but in its December 9, 2021 order, the trial court determined that Father was J.B.'s biological father "as determined by DNA testing."

[18]Father does not challenge this ruling on appeal.

[19]Hall testified that L.B. was Father's daughter's boyfriend or ex-boyfriend.

12

deadly weapon (a firearm) during the assault's commission. The complaint also contained a habitual-offender notice regarding the same 2014 and 2005 convictions that were listed in the habitual-offender notice in the previously admitted indictment.

Hall then testified that shortly after Father was released from jail at the end of June or in July—she did not recall the exact date—and before his confinement on the new charges, he called her, told her that he was staying with his sister, and gave her his sister's address. She gave him the information to set up services and was told that Father had contacted one of the contractors to start his FOCUS class. However, Father had trouble contacting his probation officer, so Hall tried to contact the probation officer, without success. She stated that her understanding was that Father had been released on an ankle monitor, and she had tried to contact Father's probation officer to find out the exact restrictions on Father's movement. She agreed that it would be difficult for Father to move around freely on an ankle monitor without communication with his probation officer.

Hall tried to send Father for a drug test but did not hear back from him, and she learned, after Father failed to attend the FOCUS class he had set up, that he "had been arrested again." Father had been arrested before he was able to participate in any services. And Father also had no visitation with J.B. in the short time he was out of jail.

Hall testified that Father had been back in jail since the end of July but that she had not been able to speak with him since his new arrest. She described the difficulty

13

she had experienced in making contact with him at the jail, stating, "They told me that I needed to go to a different building, and then when I went there the entrance was closed, and so I tried to come back another day but I didn't have time." At trial, she did not "remember offhand which building they pointed [her] toward."

Hall stated that Father had been out of jail for less than a month before returning on felony charges. Regarding Father's more recent arrest, her understanding was that "there was a shooting involved at the apartment complex where he was staying at with his sister, and . . . . there's the allegation that he shot at his daughter's boyfriend or ex-boyfriend." However, she did not know what evidence supported the State's allegation that Father had fired a firearm.

Hall testified that she believed Father had engaged in a continuing course of violent criminal conduct since the case started, that she had no reason to believe that course of conduct would stop, and that, in her opinion, it presented a danger to J.B.

J.B.'s ad litem argued during closing that Father had a continuing course of conduct leading to a life of instability for J.B. and that it was in J.B.'s best interest to have a safe and stable home.

## III. Sufficiency

Father's four issues challenge the sufficiency of the evidence to support terminating his parental rights on grounds listed in Section 161.001(b)(1).[20] DFPS was

---

[20]For a trial court to terminate a parent–child relationship, DFPS must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy

14

required to prove its grounds for termination by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(b); *Z.N.*, 602 S.W.3d at 545.[21] Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

## A. Standards of Review

To determine whether the evidence is legally sufficient in parental termination cases, we look at all the evidence in the light most favorable to the trial court's finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved,

---

one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020).

[21]Due process demands the heightened standard of clear and convincing evidence because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982)); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). The State must observe "fundamentally fair procedures" when it seeks to terminate a parent's rights. *E.R.*, 385 S.W.3d at 554 (citing *Santosky*, 455 U.S. at 747–48, 102 S. Ct. at 1391–92). We carefully scrutinize termination proceedings and strictly construe involuntary termination statutes in the parent's favor. *E.N.C.*, 384 S.W.3d at 802; *E.R.*, 385 S.W.3d at 563.

15

and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *J.F.C.*, 96 S.W.3d at 266. That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

With regard to a factual-sufficiency challenge to the termination grounds, we must perform "an exacting review of the entire record." *See In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). We nevertheless give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). As pertinent to Father's issues, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that DFPS proved that Father constructively abandoned J.B., endangered J.B., or failed to follow court orders with which he was required to comply for J.B.'s return to him. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19. But if a factfinder reasonably could not—because the disputed evidence that could not reasonably support the finding is too significant—then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

16

Along with a best-interest finding, a finding of only one ground alleged under Section 161.001(b)(1) is sufficient to support termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). However, because Subsection (M) of Section 161.001(b)(1) allows a trial court to terminate the parental rights of a parent whose parent–child relationship with another child was terminated based on a finding under Subsection (D) or (E), when a parent challenges a Subsection (D) or (E) finding, due process and due course of law demand that we address the finding and detail our analysis. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (M); *In re N.G.*, 577 S.W.3d 230, 235, 237 (Tex. 2019); *see also In re Z.M.M.*, 577 S.W.3d 541, 543 (Tex. 2019) (relying on *N.G.* to hold that the court of appeals erred by not addressing the father's sufficiency challenge to the trial court's Subsection (D) finding). Accordingly, we begin our analysis by reviewing endangerment first.

**B. Endangerment**

In his second issue, Father argues that there is no evidence or insufficient evidence to support the Subsection (E) finding that he engaged in conduct that endangered his child.

"'[E]ndanger' means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under Subsection (E), a parent's rights may be terminated if he "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the

child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). The endangering conduct need not be directed at the child, nor must the child actually suffer injury. *J.F.-G.*, 627 S.W.3d at 312. The relevant inquiry is whether evidence exists that the endangerment was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Scienter is required under Subsection (E) only when a parent places a child with others who engage in a course of conduct that endangers the child. *In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d at 500. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *A.B.*, 412 S.W.3d at 599.

Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. However, under Subsection (E), the court may consider acts occurring both before and after a child's birth—and after removal—in determining a course of conduct. *In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.). Such acts may "create an inference that similar conduct could recur and further jeopardize a child's well-being." *Id.* (quoting *In re M.W.*, No. 02-21-00146-CV, 2021 WL 3679247, at *4 (Tex. App.—Fort Worth Aug. 19, 2021, pet. denied) (mem. op.)). A parent's lack of significant contact with a child may also endanger the child's physical or emotional

18

well-being. *In re A.J.D.*, No. 02-13-00183-CV, 2013 WL 5781478, at *4 (Tex. App.—

Fort Worth Oct. 24, 2013, no pet.) (mem. op.).

### 1. Father's arguments

Father argues that "[t]he only evidence [DFPS] put on regarding [his]

knowledge of [Mother's] drug use was his statement to the caseworker that he did

everything within his power to get [Mother] to stop using drugs during her

pregnancy." He contends that Mother's testimony that he would beat her if she did

not use drugs was not credible because he was incarcerated well before J.B.'s birth and

not available to force her to take illicit drugs during that time.[22] Father argues that he

---

[22]A parent's knowledge of the other parent's drug use during pregnancy and corresponding failure to attempt to protect the unborn child from the effects of that drug use can contribute to an endangering environment and thus support an endangerment finding under Subsection (D). *In re J.W.*, 645 S.W.3d 726, 749–50 (Tex. 2022). That is, a parent cannot remain willfully ignorant of the significant risk that a pregnant mother's drug use poses, but a court may not attribute any and all known dangers posed to a child during the mother's pregnancy to the other parent because "the inquiry is necessarily dependent on the facts and circumstances." *Id.* The supreme court has stated that "if a parent actively participates in creating or maintaining a dangerous environment during pregnancy, e.g., does drugs with the pregnant mother, encourages her drug use, or supplies drugs, we see no reason why such conduct would not qualify as endangerment under Subsection (D)." *Id.* at 750 n.13. *J.W.* was a recent 5–4 decision in which the majority concluded that legally sufficient evidence supported the Subsection (O) finding but not the jury's Subsection (D) finding such that the broad-form jury charge containing both subsections required a new trial. *Id.* at 752. The opinion drew two dissents. *See id.* at 756–57 (Boyd, J., dissenting) (reiterating majority's holding that Subsection (D) protects unborn children from dangerous conditions caused by their parents but objecting that the majority ignored evidence that the father had repeatedly minimized, denied, and enabled the mother's conspicuous and continuous drug use throughout pregnancy), 759–60 (Blacklock, J., dissenting) (objecting that DFPS's case against the father under Subsection (O) "amounted primarily to speculation that he *might not* provide a safe

19

"should not lose his child because of [Mother's] failings" and that he must be judged by his actions, not hers. Father further states that although DFPS contended that he had a history of behaving violently, possessing controlled substances, and using drugs, DFPS produced no evidence to support its contentions because it produced no evidence of criminal convictions and no evidence to show that incarceration resulted from his conscious and voluntary course of conduct or that he had possessed or used controlled substances.

Father acknowledges the family-violence-assault indictment and the aggravated-assault criminal complaint introduced by DFPS but points out that these instruments are based on a probable-cause standard and not clear and convincing evidence. *See Ex parte Plumb*, 595 S.W.2d 544, 545 (Tex. Crim. App. 1980) ("The return of an indictment establishes probable cause as a matter of law."). He complains that the remaining testimony that he had been convicted of assault, that he had been in prison, that he had a long history of violent crime, and that he was on parole or bond was conclusory, ambiguous, or unproven.

### 2. Endangering course of conduct

Evidence of incarceration and its effect on a parent's ability to parent may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d 483, 492 (Tex.

---

home for his son *in the future*," which is not a predicate ground for termination); *see also id.* at 752 (Young, J., concurring) ("One dissent argues that the Court has not gone far enough; the other contends that the Court has gone too far.").

App.—El Paso 2012, no pet.); *In re A.J.M.*, 375 S.W.3d 599, 606 (Tex. App.—Fort Worth 2012, pet. denied) (op. on reh'g en banc) ("When incarceration affects the parent's ability to care for his child, to provide safe living conditions, or to ensure her safety and well-being, then such incarceration can be a part of a course of continuing conduct."). While mere imprisonment, standing alone, will not constitute endangering conduct, when all of the evidence—including imprisonment—shows an endangering course of conduct, a finding under Subsection (E) is supportable. *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Routinely subjecting a child to the probability that he will be left alone because his parent is in jail is endangering. *Id.*; *see also In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.).[23] "The State need not show incarceration was a result of a course of conduct endangering the child; it need only show incarceration was *part of* a course of conduct endangering the child." *In re D.M.*,

---

[23]In *M.R.*, the father had been incarcerated for burglary of a habitation after violating his community supervision by possessing methamphetamine. 243 S.W.3d at 819. The burglary offense had occurred before he knew the child's mother was pregnant, but he violated his community supervision for that offense a few months after the child's birth, and he received a two-year sentence. *Id.* By the time of the termination trial, he had been incarcerated for 26 months of the child's 36-month life, which affected his ability to ensure the child's proper care. *Id.* Moreover, his incarceration prevented him from obtaining better living conditions and from providing financial support for the child. *Id.* The evidence showed that the father had been aware that the mother lived with drug users and that, instead of avoiding a criminal lifestyle, his decisions had prevented him from having a role in his son's life or from providing any support. *Id.* We concluded that the evidence was factually sufficient to support the trial court's endangerment-by-conduct ground. *Id.*

58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.) (emphasis added); *see also In re P.M.M.K.*, No. 04-19-00786-CV, 2020 WL 1695499, at *3 (Tex. App.—San Antonio Apr. 8, 2020, pet. denied) (mem. op.).

Under Subsection (E), charges themselves can be relevant; they do not necessarily have to result in convictions.[24] *In re E.S.T.*, No. 01-22-00404-CV, 2022 WL 17096713, at *15 (Tex. App.—Houston [1st Dist.] Nov. 21, 2022, no pet.) (mem. op.) ("Furthermore, even non-violent, misdemeanor offenses, and arrests for criminal conduct that do not result in conviction will support a finding of endangerment." (citations omitted)); *In re S.A.*, No. 12-22-00111-CV, 2022 WL 16558456, at *5 (Tex. App.—Tyler Oct. 31, 2022, no pet.) (mem. op.) ("Criminal acts that also constitute domestic violence need not lead to indictment or conviction in order to be considered under the family code."); *In re C.W.*, No. 02-17-00025-CV, 2017 WL 2289115, at *1–2, *7 (Tex. App.—Fort Worth May 25, 2017, no pet.) (mem. op.) (noting that at time of trial, father with extensive criminal history was jailed on pending aggravated-sexual-assault-of-a-child charges and parole warrant); *In re T.G.R.-M.*, 404 S.W.3d 7, 15–16 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (noting that mother "continued to

---

[24]DFPS took a bare-bones approach to meeting its burden of proof but could have called Father to testify about his criminal history, could have called a recordkeeper with certified copies of Father's judgments of convictions, or could have called one or more of Father's alleged victims, any of which would have made this a stronger case. Nonetheless, we are constrained by the standards of review, which require us, for legal sufficiency, to look at the evidence in the light most favorable to the trial court's findings, *see Z.N.*, 602 S.W.3d at 545, and for factual sufficiency, to give due deference to the factfinder's findings, *see A.B.*, 437 S.W.3d at 500.

place herself in situations that risked her imprisonment even though she knew her parental rights were in jeopardy on the occasion of both arrests because the Department already had custody of T.G.R.-M" and that "[a]lthough the charges stemming from these two arrests were ultimately dismissed, each time the mother was jailed, she was absent from T.G.R.-M.'s life and was not able to provide for T.G.R.-M.'s physical and emotional needs"); *In re V.V.*, 349 S.W.3d 548, 553–54 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (op on reh'g en banc).[25] In addition, the failure to work a service plan—even because of incarceration—is a factor a trial court may consider in a Subsection (E) analysis. *See In re Z.J.*, No. 02-19-00118-CV, 2019

---

[25]In *V.V.*, the court held that

> [t]he record—sparse though it is—reveals the father's assault on the child's mother days before the parental termination hearing, his bad choices leading to repeated imprisonment, his wholesale lack of parenting beyond the moment of conception, and a child left in the care of the state at birth because the father was in jail and the mother had ingested opiates during the pregnancy. The child was born with opiates in her system, and her mother later voluntarily relinquished her own parental rights. In ruling a parenting forfeit, the trial court reasonably credited the evidence of the parenting void in this child's life and the father's inability to safeguard the child's physical and emotional well-being. A lack of all contact with a child without any proffered excuse and no effort to ensure her safety—coupled with multiple episodes of incarceration and an assault on the mother—is legally sufficient to support a termination finding based on endangerment. An infant who is not looked after by either of her parents, as this one was not, undeniably is in serious danger of physical and emotional injury. Settled authorities have upheld termination based on endangerment in these circumstances.

349 S.W.3d at 553–54.

WL 6205252, at *11 (Tex. App.—Fort Worth Nov. 21, 2019, pet. denied) (mem. op.);

*see also In re M.R.*, No., 2022 WL 4545534, at *6–7 (Tex. App.—Fort Worth Sept. 29,

2022, no pet.) (mem. op.).[26]

The evidence shows not only that Father had been charged with and jailed for

alleged assaultive acts against Mother before J.B. was born but also that

- Mother was pregnant in January 2021, when the State alleged Father assaulted her;

- After J.B.'s birth and before his removal, Father told Eastman that he had known Mother was pregnant and that she had been using meth "heavily" and also that he had discussed with Mother the impact her drug use could have on the child,[27] in contrast to Mother's assertions that Father had forced her to use drugs since she was 18, i.e., for 13 years by the time of J.B.'s birth;

- Father was aware that Mother had mental-health problems as she later reported to the hospital staff (in addition to her drug use), and J.B.'s medical records show that Mother was a drug addict who suffered from schizoaffective disorder and PTSD and who told the DFPS investigator that Father would beat her if she did not use methamphetamine, but she did not say when he did this or if he did so while she was pregnant;

---

[26]*M.R.* has similar facts to Father's case but is distinguishable as a stronger case for termination because, among other things, the trial court took judicial notice of its file, the father had been convicted and was serving time at the time of termination, the father had disclaimed paternity and did not attempt to see the child before his incarceration, the father had some history of drug use, and—importantly—the evidence accounted for the possibility that—unlike in the case before us—the father could have worked services at the facility where he was housed. 2022 WL 4545534, at *3–7.

[27]Mother had a long history of endangering her other children with her drug use, so even without Father's secondhand statements from Eastman, it is likely that Father was aware of Mother's drug problem even if he did not force her to use drugs.

- At some point—presumably in January 2021 but before Father was jailed and while Mother and Father knew she was pregnant—Mother and Father argued "about her drug use," she called the police, and he was arrested;

- Mathematically and physically, Father could not have forced Mother to take drugs *immediately* before J.B.'s birth when he had been incarcerated for several months by that time,[28] but the trial court could have found that he had forced her to take drugs while pregnant, which would have endangered J.B.;

- At the time of their argument, Father—by his own admission to Eastman—was either on parole or on bond[29] for "a prior family violence charge"; in other words, when he and Mother argued, he either already had a family-violence conviction or a pending charge;

- When asked in April 2022 if Father had told her "why he is currently in jail," Hall said that Father told her "that he never assaulted [Mother] and that the fraudulent identities in his car were actually [Mother's] not his"; thus, there is some evidence Father possessed fraudulent identities;

- Father was arrested on new, gun-related charges before he could work any services even though he had made an attempt to start;

- The new charges, according to Hall's understanding, allegedly occurred where Father was living with his sister, the living arrangements he had made upon his release (and which, to be in compliance with his service plan, were to be safe and stable);

---

[28]Mother's medical records reflect that she was pregnant for 40 weeks, indicating that she became pregnant during September 2020 and was approximately 17 weeks' pregnant at the time of the alleged assault.

[29]Parole and bond are not the same thing. Bond is posted by an accused as a security for his appearance to answer a criminal accusation against him. *See generally* Tex. Code Crim. Proc. Ann. arts. 17.01–.53 (discussing bail). Parole, on the other hand, is for someone whose charge has become a conviction; it is the discretionary and conditional release of an eligible inmate "so that the inmate may serve the remainder of [his] sentence under the supervision of the pardons and paroles division." Tex. Gov't Code Ann. § 508.001.

- According to Hall's testimony, Father had at least one conviction for a domestic-violence-related assault (as of April 2022, i.e., before his June 2022 release and resolution of his then-pending charges);

- Hall also testified, over no objections, that Father had approximately 20 criminal charges, and she testified that he had a "significant history" of violent crimes, domestic violence, and assaults "against almost all of the mothers of his other children," which numbered "approximate[ly] 13," most of whom were minors;

- Father had a prior CPS case; and

- Father told Eastman before J.B.'s removal that three of his other children had been removed while he was incarcerated.

From the above, the factfinder could have inferred that Father had been convicted of something (assaultive behavior or identity-fraud-related behavior) stemming from his pre-June 2021 through June 2022 incarceration; that he served the entire first year of J.B.'s life for that offense; and that before serving his time and being released in June or early July 2022, he had racked up around 20 charges and at least one assault conviction and had been incarcerated when three of his other children had been taken into CPS custody.

Further, during the limited time that he was not incarcerated during the case, Father was again arrested for a violent crime. *See In re A.W.*, No. 02-18-00147-CV, 2018 WL 5074770, at *12 (Tex. App.—Fort Worth Oct. 18, 2018, pet. denied) (mem. op.) (rejecting parent's argument that his conduct had no bearing on his arrests or on his indictments and noting that even if he was ultimately acquitted, he had not learned how to avoid situations that lent themselves to arrests and indictments); *see also In re*

*A.M.*, No. 02-16-00208-CV, 2016 WL 7046858, at *1–3 (Tex. App.—Fort Worth Dec. 2, 2016, no pet.) (mem. op.) (holding that although parent, who was incarcerated for choking child's mother while she was pregnant, blamed his incarceration for his inability to complete his court-ordered service plan, this evidence, among other things, was legally and factually sufficient to defeat his best-interest challenge).

Although this record is sparse, the trial court, as the factfinder, was the sole judge of the witnesses' credibility and demeanor, *J.O.A.*, 283 S.W.3d at 346, and viewed in the light most favorable to its endangerment-by-conduct finding, we conclude that a reasonable factfinder could form a firm belief or conviction that the finding is true, *Z.N.*, 602 S.W.3d at 545. Likewise, having performed an exacting review of the entire record, we conclude that the evidence is factually sufficient to support the trial court's endangerment-by-conduct finding. *See A.B.*, 437 S.W.3d at 500. Accordingly, we overrule Father's second issue without reaching his remaining issues. *See* Tex. R. App. P. 47.1.

## IV. Conclusion

Having overruled Father's dispositive endangerment-by-conduct issue, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: February 9, 2023

27